ESTATE OF MAYNARD C. WEDUM, DECEASED, NORTHWESTERN NATIONAL BANK OF MINNEAPOLIS, EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Wedum v. Commissioner
Docket No. 4970-83.
United States Tax Court
T.C. Memo 1989-184; 1989 Tax Ct. Memo LEXIS 180; 57 T.C.M. (CCH) 219; T.C.M. (RIA) 89184; April 24, 1989
David R. Brennan, for the petitioner. Genelle F. Forsberg, for the respondent. WILLIAMS
MEMORANDUM FINDINGS OF FACT AND OPINION WILLIAMS, Judge: The Commissioner determined a deficiency of $ 331,118.99 in Federal estate tax due from the estate of Maynard C. Wedum. After trial [1] and concessions, the issues remaining are, (1) whether the assets of six inter vivos trusts decedent established are includable in decedent's gross estate pursuant to section 2036, [2] and (2) whether claims allowed by the probate court against the estate are deductible from decedent's gross estate pursuant to section *182 2053. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Maynard C. Wedum died testate on October 15, 1978. The executor, Northwestern National Bank of Minneapolis, timely filed a Federal estate tax return on behalf of decedent. The executor's name was changed to Norwest Bank of Minneapolis ("Norwest") after the petition was filed. During his lifetime, decedent was involved in a broad range of businesses, including real estate, hardware, lumber, propane gas distribution, soft water and plumbing. Local Gas Alexandria, Inc., Local Gas Wadena, Inc., Local Gas Fergus Falls, Inc., and Local Gas Elbow Lake, Inc. were sister corporations engaged in retail sale of propane gas. Alexandria Hardware Co., a proprietorship, was engaged in retail hardware sales, Wedum Supply Co., Inc., was engaged in the wholesale plumbing and heating business, and F&W Co., a partnership, owned, operated and leased gasoline stations. Decedent, who dominated *183 the businesses, kept all of the records for each of the businesses. He maintained one main checking account for all of his businesses and used a different colored check for each business. Decedent had sole signatory authority over the account. Decedent's son, John Wedum, was involved in minor ways in keeping the books for the Local Gas businesses. The Ledger Sheets
Prior to 1960, decedent kept ledger sheets titled "Trust" for his two children, John Wedum and Carola Palm. Beginning in 1946, decedent credited an amount usually equal to the gift tax exclusion on each ledger sheet for each year. Decedent also credited amounts designated as "interest" in some of the years. John and Carola knew about the ledger accounts. Decedent never set aside the funds he recorded on the ledger accounts. Instead, he kept all of his money in his main business checking account. Decedent provided some funds to John and Carola during the years 1946 to 1960. When he provided money to them, he debited their respective ledger accounts. The total amounts debited for funds given to John and Carola prior to 1960 were $ 12,007.32 on John's trust account and $ 2,602.92 on Carola's trust account. *184 John and Carola did not know that he debited their ledger accounts when he provided them with funds. Also, prior to 1960, John gave decedent a total of $ 15,600.76 to hold and invest on his behalf. Carola gave decedent a total of $ 14,703.75 prior to 1960 to hold and invest on her behalf. On June 1, 1956, decedent debited John's ledger account balance in the amount of $ 60,000. The ledger notation is "Local Gas Co." On May 31, 1956, decedent credited Local Gas Alexandria's ledger sheet in John's name with $ 60,000, described as "Transfer from M.C. Wedum 7/1/56." Prior to this debit, John's account balance on his ledger was $ 43,082.61. Decedent also debited John's account ledger in the amount of $ 3,238 in 1958 and $ 2,400 in 1962 to "local gas." The same amounts were placed on the Local Gas Co. ledger, the $ 3,238 "As of 7-1-58 Transferred From MCW%" and the $ 2,400 dated April 21, 1962, but not otherwise identified. Carola's ledger shows a $ 40,000 debit dated January 1, 1956, described as "To F&W." Prior to the debit, Carola's ledger had a $ 39,508.28 balance. On January 1, 1958, Carola's account shows a $ 6,900 debit described "To F&W Co. to Make $ 50,000.00." The *185 1960 Trusts
On January 1, 1960, two trusts were created, one for John and one for Carola. The trust instruments state that John A. Wedum and Carola Palm are the settlors of their respective trusts. Decedent and his attorney, Robert Leach, are named co-trustees. Leach was decedent's longtime friend. Pursuant to the trust instruments, Leach had sole discretionary authority to distribute trust income to John or Carola or to accumulate the income. The co-trustees otherwise had standard authority provided to trustees, including the right to invest trust assets. The trust agreements each provide that upon the death of the settlor, the trust will terminate and the trustees will distribute the principal and any income to the settlor's children or their issue per stirpes. If the settlor dies leaving no issue, the trustees are to distribute trust principal and any income to the settlor's heirs pursuant to state law. The settlor could revoke his or her trust with Leach's approval. John's trust states that the trust asset is a "Promissory Note of Local Gas Alexandria, Inc., dated January 1, 1960, in the principal amount of $ 60,000, with interest at the rate of 6% per annum." Decedent, *186 as President of Local Gas Alexandria, Inc., executed a $ 60,000 promissory note with a 6 percent interest rate payable to John, dated January 1, 1960. Carola's trust agreement states that the trust asset is a "Promissory Note of Albert G. Frahm and John A. Wedum, a partnership, doing business as F&W Company, dated December 31, 1959, in the principal amount of $ 56,227.50, with interest at 5% per annum." Petitioner did not offer the note referred to in the trust instrument into evidence. In a document dated September 28, 1964, decedent stated that he resigned as trustee of John's trust and nominated John as successor trustee. None of the assets of John's trust were ever transferred to John. John never controlled the trust assets or kept the trust records or otherwise acted as trustee (except to sign trust tax returns from time to time which were prepared by decedent and signed at decedent's direction). There is no evidence that decedent resigned as trustee of Carola's trust. Leach, the co-trustee for both trusts, died on December 10, 1970. The trust agreements provided that Norwest was the successor trustee to Leach. Norwest was not notified of its appointment (as successor *187 at Leach's death) until after decedent's death. Decedent managed and controlled for his own interests the trust assets by himself even while Leach was living. There is no evidence that Leach acted as trustee or approved any of decedent's actions as trustee. After decedent "resigned," he continued to manage and control the assets of John's trust in the same manner that he always had. Decedent stated in prior testimony that for Leach, and then for John, "trustee" was "just an official designation." Decedent maintained the trust ledgers from the time the trusts were created until his death and kept the information to himself. No one else had normal access to the trust ledgers, including Leach. Decedent did not use separate bank accounts for the trusts; instead, assets remained in decedent's main business account over which decedent had sole signatory authority. Decedent intended for the trust assets to be accumulated during his lifetime and distributed to the beneficiaries after his death. From 1964 through 1973, decedent made credit entries to John's trust ledger identified as "interest." Decedent made similar "interest" credit entries to Carola's trust ledger from 1965 through *188 1973. Decedent never actually paid "interest" amounts to the trusts or segregated the amounts from his funds. The "interest" is reported as income on Fiduciary Income Tax Returns filed for John's trust for the years 1960 to 1973. Decedent is listed as the grantor of John's trust on the 1962 and 1963 returns which decedent prepared. Respondent has destroyed his records with respect to filing of fiduciary returns by Carola's trust. Decedent made credit entries from his businesses to John's trust ledger after 1960. Decedent identified the various credit entries as salary and bonus, partnership distributions, and director's fees on John's trust ledger, depending on which business the transfer came from. John worked for Local Gas Alexandria ("LGA"). LGA paid John a salary in cash, which John included in his gross income. In addition, from 1966 through 1973, decedent credited John's trust ledger with amounts identified as salary or bonuses from LGA as follows: Date
Amount
7/1/66
$ 4,228.00
7/67
3,400.00
7/68
3,347.20
6/30/69
3,184.00
7/1/70
24,000.00
7/23/71
22,200.00
8/29/73
22,434.00
Total
$ 82,793.20
No checks were drawn on LGA's bank *189 account payable to John or John's trust for these credits. LGA's ledger for John shows some corresponding debits: Date
Description
Amount
6/30/70
"To MCW"
$ 24,000
6/30/71
"to MCW"
22,200
6/30/73
"Transfer MCW"
22,434
John did not know the amounts were being credited to his bonus accounts. No written corporate authorization allowed the transfers. Decedent credited $ 54,676.49 to John's trust ledger from 1962 through 1973 which he recorded as transfers from Alexandria Hardware ("AH"). In addition, decedent credited $ 20,988 to John's trust ledger in 1973 described as "old bal. in contract ledger." This credit corresponds to a debit to John's AH ledger on the same date. The transfers from John's AH ledger to John's trust ledger were solely bookkeeping entries by decedent. Decedent did not actually pay or transfer funds to John or his trust. John participated in AH's business, but he had no active or regular duties with AH. Decedent treated AH in some respects like a partnership, even though there was no written partnership agreement. Decedent unilaterally decided who would be a "partner" and who would no longer be a "partner." Decedent also *190 determined each "partner's" share of the income. The distributions were not made based on partnership capital accounts. Decedent testified in a prior proceeding that he used AH to allocate his taxable income to John. John's ledger sheets reflect distributions to the trust account of $ 164,000 from F&W Co. during the years 1968 through 1978. The F&W Co. partnership agreement, dated August 26, 1952, stated that A.G. Frahm and John Wedum were the partners. Decedent, however, made all of the capital contributions to F&W. Frahm was the active manager of the F&W business. John had little or no regular activities with F&W. Decedent kept the books and records, prepared tax returns, and shared in construction and purchase decisions. The distributions from F&W were in the form of checks drawn on the F&W account, made payable to the order of decedent and John, and signed by Frahm. The checks were sent to decedent. Decedent generally stamped the checks "for deposit only" and deposited them in his account. John endorsed only two of approximately 29 checks. Both of these were also deposited into decedent's account. John was unaware of the nature or amount of the checks when he endorsed *191 them. Decedent testified in a prior proceeding that he named John partner of F&W because he wanted to avoid income tax on his partnership profits and accumulate the profits for John. During the years 1968 through 1971, decedent made credit entries totaling $ 6,300 to John's trust ledger identified as "Frahm salary from Local Gas Elbow Lake (LGEL)" or "LGEL to F&W." No checks were drawn representing these amounts. John was not aware of these entries. Decedent credited John's account with $ 21,990 in 1971 identified as "Wedum Supply Co." Decedent was the sole shareholder of Wedum Supply Co. ("WSC") until he purportedly sold 75 percent of the stock to John before his death. Decedent maintained a ledger account in John's name on the WSC books. He made various credit entries to the account with a resulting $ 21,990 balance as of December 31, 1970. Decedent debited John's WSC account by $ 21,990 with the notation "To MCW then to trust," and made a corresponding credit entry on John's trust ledger in 1971. The amount transferred was never paid to John or his trust. Decedent credited John's account with a total of $ 27,500 in director's fees from Local Gas and WSC from 1973 to *192 1978. The amounts were not authorized by the corporations and were never actually paid to John or his trust. At the time of decedent's death, the balance of John's trust was $ 387,516.33 and the balance of Carola's trust was $ 103,573.49. The Palm Trusts
John M. Palm, Laura Palm, Steven Palm and Robert Palm are Carola Palm's children and decedent's grandchildren. Decedent and his wife Mabel executed four trust agreements, one for each grandchild, on October 1, 1962 (the "Palm Trusts"). The trust agreements are identical except for the named beneficiary. Decedent is the trustee of each trust and each child is the beneficiary of his or her respective trust. The trusts reserve the power in decedent, as trustee, to distribute any part of the income or principal to the beneficiary or to accumulate the amounts not distributed. The Palm trust agreements provide that the trusts will terminate when the beneficiary reaches age 21. Documents entitled Supplements to Trust Agreement, dated December 31, 1966, state that decedent resigned as trustee of the Palm trusts and that John accepted the designation as successor trustee. Decedent never transferred the Palm trusts' assets *193 to John. John did not control or manage the Palm trust assets at any time. John also did not keep any of the trust records or otherwise act as trustee. Decedent retained possession and control of the assets of the Palm trusts and still had possession of the assets at his death. Decedent kept ledgers for each of the trusts. He made credit entries to the trust ledgers from 1962, the year he created the trusts, through 1976. The credit entries were identified as gifts or interest. The "gifts" and "interest" were not paid to the trusts or segregated from decedent's business funds. At the date of decedent's death, the Palm trust ledgers had the following balances: Laura, $ 173,496.02; Steven, $ 208,544.72; John, $ 188,931.99; and Robert, $ 155,028.44. Laura Palm and Steven Palm reached age 21 in 1974 and 1976, respectively. Neither decedent nor John followed the Palm trust agreements which called for termination of the trusts at the time the beneficiaries attained majority. In decedent's records of his annual net worth, decedent listed amounts for the Palm children as a liability until December 31, 1965. Beginning with his January 1, 1967, net worth account, however, decedent *194 crossed out the amounts that he had listed for the Palm children. In a letter dated October 28, 1976, decedent wrote Carola that he had terminated the Palm trusts. In addition, decedent testified in a prior proceeding that he intended for the beneficiaries to receive the trust funds after he died, not while he was living. Decedent died on October 15, 1978. Decedent's will provided to his surviving spouse, Mabel Wedum, all furniture, automobiles, or articles of personal property, payments of income from a testamentary trust the corpus of which consisted of 25 percent of decedent's residuary estate, and a life estate in decedent's homestead. Decedent also made a specific bequest of $ 400,000 to Carola Palm. The residue of the estate passed to the Wedum Foundation, a qualified charitable organization. Prior to the filing of the estate tax return, John A. Wedum, Carola Palm and each of the four Palm children filed a claim against the decedent's estate for an accounting of their trust assets. Mary Beth Wedum, John's wife, and her two children, Dana and Dawn, filed claims against the estate because they believed decedent may have established trusts for them also. The Wedum Foundation *195 filed a claim against the estate as the principal residuary beneficiary for an accounting and a disbursement to it of its funds. A settlement agreement, dated July 13, 1981, provided for a distribution of assets relating to the trust claims as follows: John A. Wedum
$ 300,000.00
Carola Palm
$ 103,000.00
John Palm
55,500.00
Laura Palm
55,500.00
Steven Palm
55,500.00
Robert Palm
55,500.00
Mary Beth Wedum
6,636.05
Dana Wedum
6,640.00
Dawn Wedum
6,640.00
Each of the beneficiaries, petitioner, and the Attorney General for the State of Minnesota signed the settlement agreement. The executor timely filed an estate tax return and reported a $ 4,569,052.63 gross estate and a $ 3,119,299.05 charitable deduction. The $ 625,000 in trust assets later paid to John, Carola and the Palm grandchildren pursuant to the settlement agreement were included in the gross estate and in the charitable contribution deduction. OPINION We must determine whether the assets of six inter vivos trusts decedent established are includable in decedent's gross estate pursuant to section 2036. Prior to 1960, decedent credited amounts on ledger sheets designated "trusts" *196 for John and Carola. These funds were never separated from funds used in decedent's businesses and appear to have been always subject to the claims of decedent's general creditors. John and Carola also gave decedent some funds for safekeeping which decedent entered on the ledger sheet accounts. The ledger sheets also reflect loans made to decedent's business from accumulations in the accounts. In 1960 John and Carola each executed a trust instrument in which each is settlor and beneficiary of a trust. Decedent and his attorney were co-trustees of each trust, and the attorney had sole discretionary authority to distribute income to the beneficiaries or accumulate income. Each trust describes the trust asset as the note reflecting the loans to decedent's businesses from the pre-1960 accounts. Decedent and his wife created four irrevocable trusts for their grandchildren, Carola Palm's children, in 1962. Decedent was trustee of all of the trusts and had discretionary authority to accumulate the trust income. Decedent maintained trust ledger sheets but did not segregate the trust funds. Although he credited amounts to the trust ledger sheets, he never transferred any funds. The *197 amounts credited to the Palm trusts also appear to have been subject to the claims of decedent's general creditors at all times. Section 2036 [3] provides that the value of the gross estate includes the value of all property which the decedent transferred by trust or otherwise and in which he retained for life, or a period not ascertainable without reference to his death, (1) the possession, enjoyment of, or right to income from the property, or (2) the right, either alone or in conjunction with any person, to designate the persons who could possess or enjoy the property or the income therefrom. The policy underlying section 2036 is to subject to tax "all property which has been the subject of an incomplete inter vivos transfer." United States v. O'Malley,383 U.S. 627, 631 (1966). *198 For section 2036 to apply, decedent had to be the transferor of the trust property and had to retain one of the prohibited interests in or powers over the transferred property. Inclusion of the 1960 trust assets in decedent's estate, therefore, is required only if decedent was in fact the settlor of the trusts. The first issue we must decide, therefore, is who transferred the assets to the 1960 trusts. Typically a trust instrument describes the transferor as the settlor. MacManus' Estate v. Commissioner,172 F.2d 697 (6th Cir. 1949), affg. 8 T.C. 330 (1947), cert. denied 337 U.S. 938 (1949). Terminology of a trust instrument is, of course, not conclusive. The estate tax law is concerned with who provided the funds or property that became part of trust corpus. Estate of MacManus v. Commissioner, supra;Blackman v. United States,98 Ct. Cl. 413, 48 F. Supp. 362, 368 (1943); Estate of Sinclaire v. Commissioner,13 T.C. 742, 746 (1949). Because the corpus of the 1960 trusts came from funds identified on the pre-1960 ledger sheets, the identity of the settlor of each trust turns on who was *199 the beneficial owner of the transferred funds. Decedent, John and Carola should each be considered as settlor of the 1960 trusts to the extent that the amounts on the pre-1960 ledger sheets belonged to each. Petitioner argues that the pre-1960 ledger sheets were trusts held for the benefit of John and Carola and, therefore, that the notes used to fund the 1960 trusts belonged to the beneficiaries, John and Carola. In petitioner's view, John and Carola transferred the notes to fund the 1960 trusts. Respondent contends that the amounts reflected on the pre-1960 ledger sheets were not held in trust and that the amounts entered on the ledger sheets were beneficially owned by decedent. Petitioner, who has the burden of proof, has proven that John gave decedent $ 15,600.76 and Carola gave decedent $ 14,703.75 prior to 1960 for safekeeping and investment. John and Carola testified to these facts, and their testimony was unimpeached. Also, decedent entered these amounts on John and Carola's respective ledger sheets. Petitioner has failed to prove, however, that the remainder of the pre-1960 account funds belonged to John and Carola. Petitioner argues that decedent created trusts *200 for John and Carola as evidenced by the ledger sheets. State law determines whether decedent created valid trusts prior to 1960. The elements of a valid express trust in Minnesota are: "(1) a designated trustee subject to enforceable duties, (2) a designated beneficiary vested with enforceable rights, and (3) a definite trust res wherein the trustee's title and estate is separated from the vested beneficial interest of the beneficiary." (Fn. ref. omitted.) In Re Bush's Trust,249 Minn. 36, 81 N.W.2d 615, 620 (1957). No particular form or words are required to create a trust. In Re Bush's Trust, supra at 619. In this case, decedent made entries on the ledger sheets, but retained complete dominion and control over the use of corresponding funds. He did not keep the amounts in a fund separate from his everyday business account. Instead, he kept all of his funds in one account used in the ordinary course of his businesses over which he had sole signatory authority. We conclude that the third element of a valid trust was not met. See Farmers State Bank of Fosston v. Sig Ellingson & Co.,218 Minn. 411, 16 N.W.2d 319, 323 (1944). Decedent did *201 not hold a definite trust res with the legal title separated from the beneficial interest. Instead, he held both legal and beneficial title over any amounts he credited to the ledger accounts, and he freely exercised dominion over those amounts for his own businesses' benefit without being accountable for such use. The creditors of decedent's businesses could have looked to these commingled funds for satisfaction of the businesses' debts. Except for the portion of the funds given by John and Carola to decedent for safekeeping, decedent contributed the amounts credited to the 1960 trusts. Although it is difficult to determine the decedent's share of the contributions to each trust from the record we have found his share as follows: With respect to John, $ 60,000 was credited to his 1960 trust in the form of a note from Local Gas Alexandria and $ 12,007.32 was debited to his ledger sheets representing funds decedent transferred to John prior to 1960. The total amount debited to John's favor, therefore, was $ 72,007.32. The evidence supports the inference that most of the funds debited to the ledger sheet were decedent's, but we cannot find on this evidence that John did not receive *202 any of his own money back. We believe that a proportionate amount of the funds debited to the ledger sheet should be treated as being paid out of the funds that John had given decedent for safekeeping. Viewing decedent's transfer to the 1960 trust as a proportionate amount of the funds recorded in the ledger sheet, we find that decedent contributed 78 percent of $ 60,000, viz, $ 46,800 [($ 72,007.32 - $ 15,600.76) / $ 72,007.32]. [4] With respect to Carola's 1960 trust, $ 56,227.50 was credited to her trust (the note from F&W Co.). Decedent had distributed $ 2,602.92 to Carola, debiting the trust account. The total amount debited, therefore, was $ 58,830.42. Decedent's proportionate share of the $ 56,227.50 note was 75 percent [($ 58,830.42 - $ 14,703.75) / $ 58,830.42] viz, $ 42,170.63. Respondent argues that the 1960 trusts were not valid. The 1960 trust agreements, however, designated decedent and Leach as *203 trustees with enforceable duties. The trust instruments designated John and Carola as beneficiary of their respective trusts with enforceable rights. Both trusts had a definite trust res, the promissory notes, and the trustee's title in the notes was separated from the beneficial interest. We believe, therefore, a Minnesota court would have found the 1960 trusts to have been valid. In Re Bush's Trust, supra.
Petitioner argues that certain amounts credited to John's trust account after 1960 were transferred by John. Decedent identified credit entries to John's trust as salary, bonuses, partnership distributions and directors' fees from LGA, AH, F&W, WSC, and Local Gas. Although decedent credited these amounts to John's trust, the transfers from LGA, AH, WSC and Local Gas were merely paper transfers. John was not aware that the transfers were made. Indeed, some of the debits to the LGA ledger were described as made on behalf of the decedent. Decedent indisputably retained complete control over the source, amount and timing of the transfers. Although John was employed by LGA, he received his salary from LGA in cash. John participated to some extent in AH's *204 business, but he had no regular or active duties. Moreover, decedent testified in a prior proceeding that he used AH to allocate his own taxable income to John. Although John is named as a partner in the F&W partnership agreement, he had little or no regular activities or responsibilities with the partnership. Decedent made all of the capital contributions, shared in decision making with his named partner but not with John and kept the F&W records. Decedent previously testified that he named John a partner to avoid income tax on his own partnership profits. On this record, we find the decedent was the transferor of the credit entries identified as from LGA, AH, F&W, WSC and Local Gas. John had no right to the funds or the ability to obtain the funds. Decedent retained complete control over the credited amounts which he admitted in prior testimony were his funds. Decedent, not John, contributed these amounts to the trust account. All of the post-1960 amounts credited to the accounts are attributable to decedent. See Estate of Karagheusian v. Commissioner,23 T.C. 806 (1955), revd. on another issue 233 F.2d 197 (2d Cir. 1956). We have concluded *205 that decedent was the transferor of 78 percent of the initial corpus of John's 1960 trust, 75 percent of the initial corpus of Carola's 1960 trust, and all funds contributed after 1960. We now return to section 2036 to determine whether a proportionate amount of the 1960 trust assets and whether the Palm trust assets must be included in decedent's gross estate. Petitioner argues that decedent did not retain a prohibited interest in any of the trust assets and section 2036, therefore, does not require inclusion of the assets in the gross estate. Section 2036(a)(1) requires inclusion in the gross estate of the value of property if decedent retained either "possession or enjoyment" of property or retention of "the right to income" from property. McNichol's Estate v. Commissioner,265 F.2d 667, 670 (3d Cir. 1959), affg. 29 T.C. 1179 (1958), cert. denied 361 U.S. 829 (1959). The possession and enjoyment and the right to income need not be specified in the trust agreement or legally enforceable. Skinner's Estate v. United States,316 F.2d 517 (3d Cir. 1963); McNichol's Estate v. Commissioner, supra at 669-670; *206 Estate of Wedum v. Commissioner,T.C. Memo. 1986-247. An implied agreement or understanding that decedent would retain control of the property for his benefit during his lifetime will cause that property to be included in decedent's gross estate. Estate of Hendry v. Commissioner,62 T.C. 861, 873 (1974); Estate of Kerdolff v. Commissioner,57 T.C. 643 (1972). We may find an implied agreement based on the circumstances of the transfer and the use of the transferred property. Skinner's Estate v. United States, supra;Estate of Barlow v. Commissioner,55 T.C. 666 (1971). The circumstances must show that the agreement was contemporaneous with the transfer. Estate of Barlow v. Commissioner, supra at 670. In Estate of Hendry v. Commissioner, supra, decedent transferred his ranch to his wife. Both prior to and after the transfer, decedent farmed the ranch property. We found that although decedent and his wife did not expressly agree, they impliedly agreed at or before the transfer that decedent would continue to farm the property as if it were his own and would retain *207 the possession, enjoyment and income from the ranch. Estate of Hendry v. Commissioner, supra at 873. Decedent had the same use of the property before and after the transfer. Decedent deposited the ranch revenues in his personal checking account even after the transfer. We found this complete control "highly indicative of the fact that decedent continued to enjoy or possess the property." Estate of Hendry v. Commissioner, supra at 873. The value of the property, therefore, was includable in decedent's gross estate pursuant to section 2036(a). Similarly, in this case, decedent treated the trust funds as his own. He did not segregate the trust funds, but kept them in his business checking account. Decedent had the same use of the funds before and after he credited an amount to the 1960 trust accounts or the Palm trust accounts. The complete control that decedent exercised over the trust funds persuades us that he continued to enjoy or possess the property until his death. Estate of Hendry v. Commissioner, supra;Estate of McCabe v. United States,201 Ct. Cl. 243, 475 F.2d 1142 (1973). Petitioner relies heavily *208 on the legal rights created by the documentation of the trusts and the restrictions imposed on decedent. The decedent created two inter vivos trusts for his children, by their terms irrevocable with no expressly retained beneficial interests. An independent trustee was to have sole authority over income distribution and accumulation. The beneficiaries, John and Carola, were aware that decedent kept trust accounts for them. Decedent also created four trusts for his grandchildren and retained the right to accumulate or distribute the income as trustee. Later, he resigned as trustee and named John successor trustee. The problem with petitioner's position, however, is that reality diverged significantly from what was legally required. The independent trustee for John's and Carola's trusts, and John, as trustee for the Palm trusts, did not administer the trusts in any respect. Decedent acted as trustee for all of the trusts without consulting the independent trustee or John. Decedent testified in a prior proceeding that he handled the trusts by himself and the independent trustee was "just an official designation." Even after he resigned as trustee of the Palm trusts, decedent *209 retained complete control over the assets. We find that the dealings between the independent trustee, John, the beneficiaries and the decedent gave rise to an implied agreement that decedent would retain control of the amounts credited to the trust funds for his benefit during his lifetime. Estate of McCabe v. United States, supra.
The decedent also testified previously that he intended for the trust assets to be accumulated during his life and to be distributed to the beneficiaries after his death. The purpose of section 2036 would be defeated by allowing the avoidance of an estate tax by a settlor who in form, transferred the property, but in substance, retained control over it. See Commissioner v. Estate of Church,335 U.S. 632, 645 (1949). We believe the settlement agreement reflects the actual amounts in trust at the time of decedent's death. The values of John's and Carola's trusts, therefore, are $ 300,000 and $ 103,000, respectively. The values of the Palm trusts are $ 55,500 for each trust, or $ 222,000 total. Consequently, we hold that 95.60 percent [($ 46,800 + $ 240,000) / ($ 60,000 + $ 240,000] of the value of John's trust account, *210 $ 286,800, and 86.35 percent [($ 42,170.63 + $ 46,772.50) / ($ 56,227.50 + $ 46,772.50)] [5] of the value of Carola's trust account, $ 88,940.50, are includable in decedent's gross estate pursuant to section 2036(a)(1). Further, we hold that the total of the amounts credited to the Palm trust accounts, $ 222,000, is includable in decedent's gross estate. Sec. 2036. Petitioner relies on United States v. Byrum,408 U.S. 125 (1972), for its position that decedent did not retain possession or enjoyment of the property or the right to income from the property. As we discussed in our opinion denying petitioner's motion for partial summary judgment, petitioner's reliance on Byrum is misplaced. See Estate of Wedum v. Commissioner,T.C. Memo. 1986-247. We see no need to reiterate our view especially now that we have the facts before us that demonstrate decedent's unfettered control over the use, possession *211 and enjoyment of the trusts' property. Petitioner argues that the beneficiaries' claims are deductible because they were allowed as part of settlement of litigation involving adverse parties (the Wedum Foundation, the Attorney General and the claimants). Respondent contends that section 2053(c)(1)(A) precludes a deduction because the claims were founded on a promise or agreement that was not supported by adequate and full consideration in money or money's worth. Section 2053(a) [6] allows a deduction from the gross estate for claims against the estate that are allowable by the laws of the jurisdiction under which the estate is being administered. The regulations pursuant to section 2053 provide that a local court decision allowing a claim will ordinarily be accepted if that court considered all facts relevant to the claim's deductibility. Sec. 20.2053-1(a)(2), Estate Tax Regs. Section 2053(c), however, generally limits the deduction for claims based on a promise or agreement to the extent "they were contracted bona fide and for an adequate and full consideration in money or money's worth." The trust agreements on which the beneficiaries' claims rested, of course, fail this *212 test. Petitioner tries to disclaim section 2053(c) by *213 arguing that the beneficiaries had an absolute right to their respective trusts when the terms of the trust were met and, therefore, the claims were each based on the estate's possession of the trust assets, not on contractual rights. Petitioner also argues that section 2033 does not require inclusion of the assets in the gross estate because decedent did not have any interest in the assets. While correct insofar as it goes, this argument does no more than restate petitioner's position on the applicability of section 2036. Section 2033 provides the general rule for inclusion in the gross estate of the value of all property that decedent had an interest in at death. Some lesser interests a decedent retained, however, are also included in the gross estate by other provisions. As we discussed in our first opinion in this case, Wedum v. Commissioner,T.C. Memo. 1986-247: If the decedent possesses only a life estate or life interest which terminates upon his death, however, section 2033 will not cause the value of this interest to be included in the gross estate. Sections 2034 through 2045 are, therefore, designed to include in the gross estate property transferred *214 during life where the decedent-transferor maintains some affinity with the property less than that which would cause the property to be includable in the gross estate pursuant to section 2033. Such transfers would otherwise escape the rather loosely woven net of section 2033. [51 T.C.M. 1225, 1227, 55 P-H Memo T.C. par. 86,247 at 1049.] Petitioner's argument would largely undermine the effectiveness of section 2036. Decedent transferred his property into trust but violated his fiduciary duties as trustee by using the trust property as his own. Each beneficiary had a personal claim against him at his death for the amount of the converted assets. Section 2036, however, is designed to prevent individuals from avoiding estate tax on property they continued to enjoy until their death but which appears to have been transferred to others. To allow a deduction to the estate for the amount of the property legally belonging to the trust beneficiaries but enjoyed by decedent as his own would emasculate section 2036. We believe section 2053(c) specifically forecloses deductibility of the beneficiaries' claims because the beneficiaries provided no consideration in money *215 or money's worth for the assets in the trusts [7] each of which is an agreement. [8] This result is consistent with the policy underlying the estate tax provisions to tax property which decedent did not transfer completely inter vivos. We hold that section 2053(c) precludes a deduction for the beneficiaries' claims against the estate. Decision will be entered under Rule 155.
Footnotes
1. See Estate of Wedum v. Commissioner,T.C. Memo. 1986-247↩. 2. All section references are to the Internal Revenue Code of 1954 as in effect at the date of decedent's death unless otherwise indicated.↩
3. SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE. (a) GENERAL RULE. -- The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death -- (1) the possession or enjoyment of, or the right to the income from, the property, or (2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.↩
4. The numerator of this fraction (and for Carola's fraction, infra↩) is the total amount debited to John's (Carola's) favor less the amount John (Carola) gave decedent for safekeeping. The denominator is the total amount debited to John's (Carola's) favor.
5. The numerators of these fractions are the amounts decedent contributed to the 1960 trusts at formation plus all subsequent amounts decedent credited to the trusts. The denominators are the total amounts in the trusts at decedent's death.↩
6. SEC. 2053. EXPENSES, INDEBTEDNESS, AND TAXES. (a) GENERAL RULE. -- For purposes of the tax imposed by section 2001, the value of the taxable estate shall be determined by deducting from the value of the gross estate such amounts -- (1) for funeral expenses, (2) for administration expenses, (3) for claims against the estate, and (4) for unpaid mortgages on, or any indebtedness in respect of, property where the value of the decedent's interest therein, undiminished by such mortgage or indebtedness, is included in the value of the gross estate, as are allowable by the laws of the jurisdiction, whether within or without the United States, under which the estate is being administered. * * * (c) LIMITATIONS. -- (1) LIMITATIONS APPLICABLE TO SUBSECTIONS (a) AND (b). -- (A) CONSIDERATION FOR CLAIMS. -- The deduction allowed by this section in the case of claims against the estate, unpaid mortgages, or any indebtedness shall, when founded on a promise or agreement, be limited to the extent that they were contracted bona fide and for an adequate and full consideration in money or money's worth; * * * ↩
7. The portions of their respective trusts representing amounts paid by John and Carola, as we have held, are not includable in decedent's estate and are not at issue in this discussion. ↩
8. Decedent's meticulous records do not show any amounts designated for Mary Beth Wedum (John's wife) and their children, Dana and Dawn. The amounts awarded to them pursuant to the settlement agreement may have been merely a nuisance settlement. If so, the claims would not represent personal obligations of the decedent and the amounts paid to compromise the claims would not be allowable deductions. Sec. 2053(a); sec. 20.2053-4, Estate Tax Regs.; Estate of Fry v. Commissioner,9 T.C. 503↩ (1947).