WEDUM SUPPLY COMPANY, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wedum Supply Co. v. Commissioner
Docket No. 37280-86
United States Tax Court
T.C. Memo 1990-468; 1990 Tax Ct. Memo LEXIS 513; 60 T.C.M. (CCH) 629; T.C.M. (RIA) 90468; August 29, 1990, Filed *513 Decision will be entered under Rule 155. Phillip H. Martin, Linda M. Freyer, and J. Marquis Eastwood, for the petitioner. Frank M. Schuler, for the respondent. COLVIN, Judge. COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION By statutory notices of deficiency dated June 17, 1986, and July 1, 1986, respondent determined deficiencies as follows: Taxable Year
Amount of Deficiency
1981
$ 53,403
1982
20,085  1983
2,822   1984
6,028   *514 In July 1981, petitioner received a group of consumer accounts receivable with total face value of about $ 162,664 in exchange for release of a debt of $ 162,664 owed by another party. After concessions by the parties, the sole remaining issue is whether petitioner is entitled to bad debt deductions under section 166 [1] of $ 111,568 for 1981 and $ 51,095 for 1982 for the consumer accounts receivable. As discussed below, we hold that petitioner failed to prove that the debts had value when received or that the debts became worthless in the years claimed. FINDINGS OF FACT Some of the facts are stipulated and are so found. 1. Petitioner
Petitioner is a Minnesota corporation in the wholesale hardware business with its principal place of business in *515 Alexandria, Minnesota, at the time of the filing of the petition. It was formed and owned by Maynard C. Wedum (decedent). [2] During the years at issue, petitioner used the accrual method of accounting and reported income based on the calendar year. Petitioner took bad debt deductions in the amounts of $ 111,568 for 1981 and $ 51,095 for 1982. 2. The Wedums
Before his death, the decedent held an ownership interest in petitioner and several other businesses, including the Wedum Alexandria Hardware Store, a Culligan soft water business, and Budget Services. The decedent acted as a banker for his various companies by funding them based on their cash flow needs and by transferring funds between the companies. He commingled bank accounts. He made loans among his companies and charged interest. Although bookkeepers made journal entries, the decedent *516 personally maintained a master ledger for all of his companies. John Wedum, the decedent's son, received a Bachelor of Science Degree in Economics from the University of Minnesota and had a year of pre-law courses. He took accounting courses and had work experience in accounting and collections. Following 4 1/2 years in the Navy, he worked for two firms in San Francisco before going to work for the Alexandria, Minnesota, local gas company in 1958. He started out delivering cylinders and worked his way up to become the General Manager. The decedent was the major stockholder of the gas company. In 1977, a decision was made to sell the local gas companies. John Wedum and his father had a serious dispute and became estranged from one another. After the dispute, they had no further business or personal association with one another. At that time, John Wedum took the proceeds from the sale of his share of the stock from the gas companies and moved from Alexandria to Minneapolis where he resided until 1980. In 1980, he moved to Idaho and lived there until 1986. John Wedum had no further involvement in the business operation of petitioner until his father's death on October 15, 1978. *517 Although the decedent sent John Wedum petitioner's annual financial statements during that time, John Wedum had no contact with petitioner's employees and had no other information about petitioner. 3. Budget Services
The decedent and Charles Lewis formed Budget Services as a partnership. Budget Services was funded by the decedent with $ 582,320 borrowed from petitioner. Initially, Budget Services' primary function was to purchase conditional sales contracts from the decedent's companies and to help the decedent's companies manage their accounts receivable. It did this by aiding collection efforts and establishing budgets for the companies. Later, Budget Services purchased accounts receivable from third parties. These accounts receivable were primarily conditional sales contracts or installment contracts for the sale of appliances, televisions, refrigerators, furnaces, and other items sold by the decedent's companies and third parties, i.e., consumer accounts receivable. Nearly all of the Alexandria, Minnesota, gas company's receivables were sold to Budget Services. Most of the consumer contracts came from third parties. The security in these consumer items depreciates *518 rapidly. During the period 1972 through 1977, Budget Services was very successful in collecting the accounts, with only two or three percent being uncollectible. Budget Services ceased being a partnership in March 1978, when it became a sole proprietorship wholly owned by the decedent. As of January 1, 1978, and at the time of the decedent's death, petitioner was owed $ 582,320 by either the decedent or his companies. As of the date of the decedent's death, petitioner also owed the decedent, individually, $ 419,990 for petitioner's expenses that had been paid by decedent Maynard Wedum. During the course of the administration of the Estate of Maynard C. Wedum (estate), petitioner's $ 419,990 debt to the decedent was offset against the $ 582,320 indebtedness owed by Budget Services to petitioner. After accounting for interest, Budget Services owed petitioner the balance of $ 162,664. As of January 1, 1981, Budget Services still owed petitioner $ 162,664. This obligation was carried on petitioner's financial statements for the year ending December 31, 1980, prepared by the accounting firm of McGladrey Hendrickson & Co. The parties agree that Budget Services owed $ 162,664 *519 to petitioner. The estate, which operated Budget Services, had sufficient assets to pay the $ 162,664 to petitioner. 4. The Dispute Between John Wedum and the Estate of Maynard Wedum
Claims were made against the estate by John Wedum, his children, his sister, and her children, within four months of the decedent's death. Included were John Wedum's claims that: (1) he owned 75 percent of petitioner's outstanding stock; (2) the estate owed him certain monies because of contractual obligations by the decedent prior to death; and (3) he was entitled to the assets in a trust established by the decedent. Under the decedent's will, 75 percent of the estate's assets were to go to the Wedum Foundation (foundation), which was represented by Minneapolis attorney Alan C. Eidsness during the entire dispute. The foundation is a nonprofit foundation established by the Wedum family. The estate and John Wedum had separate counsel. Petitioner did not have separate counsel during this dispute. The only members of the foundation board of directors were John Wedum and Mayo Johnson. John Wedum had potential conflicts of interest because of claims he had made against the estate. Because *520 of the potential conflicts, two more directors were appointed. The three directors other than John Wedum were consulted on matters involving John Wedum's claims. The estate and the foundation agreed that the foundation's attorneys should handle the disputes because the foundation was the principal beneficiary. Thus, in addition to representing the foundation, Mr. Eidsness was the estate's principal attorney in defending and negotiating claims against the estate. John Wedum submitted a formal claim in Minnesota probate court for 75 percent of petitioner's stock. The estate denied the claim. John Wedum sued the estate on or about May 24, 1979. He was represented by counsel in the lawsuit. Until the ownership issue was settled, the estate and the foundation took the position that the estate, through its executor, Northwestern National Bank of Minneapolis, was the 100 percent shareholder of petitioner. The executor had been operating petitioner since decedent's death. 5. Settlement of the Dispute
In March 1981, the foundation for the estate informed John Wedum that i would give him $ 400,000 if he dropped his claim or that he could buy the estate's interest for $ 600,000. *521 John Wedum rejected the offer. Before settling the lawsuit, John Wedum looked at a financial statement for petitioner's most recent year. He obtained no other financial information, and he did not consult with anyone as to petitioner's value. He unsuccessfully attempted to attend a board meeting and tried to obtain financial records. When John Wedum evaluated the terms of the settlement, he knew of a note in petitioner's financial statement that read: Related party transactions. The company is related through common ownership of the M. C. Wedum estate, to Budget Services a sole proprietorship. The company had $ 162,664, due from Budget Services, as of December 31, 1980, and 1979. * * * The foundation and the estate placed a value on petitioner's stock, but did not disclose it to John Wedum. John Wedum based his negotiations on petitioner's book value of $ 1,187,424. John Wedum offered $ 500,000 in exchange for the estate's interest in petitioner. He also proposed to a representative of the executor, probably Halsey Halls, that the $ 162,664 owed to petitioner by the estate be offset against the $ 500,000 amount. The estate and foundation accepted the $ 500,000 offer, *522 but rejected the offset proposal. John Wedum executed a settlement agreement with the estate on or about July 23, 1981. The agreement provided that John Wedum owned 51 percent of the stock of petitioner, with the estate owning the remaining 49 percent. Also, as part of the settlement, petitioner and the estate entered into a redemption agreement dated July 27, 1981. Under the redemption agreement petitioner redeemed the remaining 49 percent of its stock held by the estate in exchange for $ 500,000 payable $ 200,000 in cash at closing, and the remaining $ 300,000 balance over time with interest on the unpaid balance. Thus, John Wedum ended up owning 100 percent of the stock of petitioner. The $ 162,664 was not specifically addressed in the settlement agreement. No corporate officer of petitioner executed the settlement agreement. Petitioner did not have separate counsel during the negotiations leading to the settlement. Instead, it was represented by either the foundation or John Wedum, depending upon who was going to end up with petitioner's stock at a particular moment. John Wedum never asked the estate for payment of the $ 162,664 owed to petitioner, other than seeking *523 to offset it against his $ 500,000 payment for the estate's interest in petitioner. Instead, in late summer or fall of 1981, John Wedum asked the estate to give petitioner certain accounts receivable. In response to his claim, the estate arranged to convey to petitioner, through John Wedum, a group of accounts receivable. John Wedum agreed to accept the accounts without reviewing any of the account cards. He had no input in selecting the particular accounts, and he did not know what accounts he was going to receive. He testified that he felt the accounts receivable had "some value" and that he would not have agreed to the settlement if they had no value. Mr. Halls, a vice president for the executor of the estate, wrote a letter to Mr. Eidsness, dated July 28, 1981, asking Mr. Eidsness to provide John Wedum with the list of accounts receivable. Mr. Eidsness could not recall how the list got from Mr. Eidsness to John Wedum. Selections for the list were made by someone working for the executor of the estate. According to Mr. Eidsness, the estate and foundation felt that John Wedum would have less difficulty than they did collecting on the accounts because he was from the Alexandria *524 area and because he was a Wedum. The record does not show that John Wedum was ever advised of the value or the probability of collecting the consumer accounts which were a part of the $ 162,664 receivable. Neither Mr. Eidsness nor Charles Lewis, the former Budget Services partner, ever discussed the probability of collecting the Budget Services' accounts receivables with John Wedum between 1978 and 1981. 6. Collection Efforts
John Wedum made some effort to collect the amounts stated on the accounts receivable. However, he collected very little. John Wedum received the Budget Services account cards with contracts attached in August 1981. He took them to his condominium in Minneapolis and had his secretary prepare a computer data base for the accounts receivable and analyze them. Nearly three-fourths of the consumer accounts receivable cards indicated that the balances due to Budget Services had become zero before they were transferred to petitioner. Many of the remaining accounts had been inactive with last payments made in 1978 and 1979. Some of the cards showed that Budget Services had transferred the account to another entity, possibly another Wedum enterprise. Other *525 cards indicated that the accounts had been paid by a dealer or charged to a dealer's reserve account. A review of the accounts showed that petitioner had received a mess. John Wedum was alarmed that the accounts had gotten so far out of hand and by the lack of work done on the accounts. In 1981, he showed Charles Lewis a list of the accounts and asked if Mr. Lewis could help with collection. John Wedum had two other meetings and one telephone conversation with Mr. Lewis. Mr. Lewis believed John Wedum was genuinely trying to collect the accounts in the summer and fall of 1981. In the fall of 1981, Mr. Lewis felt that collecting the accounts was not very probable. John Wedum knew that collecting the accounts receivable would be difficult. He set up an office in Alexandria where he kept the account cards and attempted some mailings and telephone contacts to collect the accounts. He traveled to Alexandria to work on the accounts every other week or once a month. He typically went to work at noon and spent most of the afternoon there. A bookkeeper in Alexandria, a newly hired employee in Minneapolis, his wife, and he worked on collection. Their success at locating debtors was *526 poor to average. Their success at collection was poor. Up until the date of trial, John Wedum had collected no more than $ 300 or $ 400. The amounts collected were treated as income by petitioner. John Wedum did not collect anything in 1981. He said that he chose not to sue the estate or anyone else over the accounts payable because, when the dismal collection situation became apparent, he was sick of litigation. 7. The Tax Returns
Petitioner used the reserve method to compute its bad debt deduction. Sec. 166(c); Income Tax Regs. sec. 1.166-3. Petitioner treated the debts at issue here as bad debts that were extraordinary in amount, and deducted them as worthless in 1981 and 1982, instead of accounting for them through the bad debt reserve. Respondent does not deny that petitioner handled this matter consistent with Revenue Ruling 74-409, 1974-2 C.B. 61, except as discussed in this opinion. Petitioner deducted $ 111,568 as a bad debt from its income in 1981. This was based on the accounts believed to have the worst history of collection activity, such as those that had indications of filing for bankruptcy. John Wedum learned of the bankruptcy filings *527 after he received the cards from notations on the cards, but before the end of 1981. The notations were on the cards when he received them. Petitioner's 1981 return explained the bad debt deduction as follows: Form 1120 Bad Debt Deduction. The company is deducting an extraordinary bad debt ot [sic] $ 111,568 which is not being charged against the reserve for bad debts. The company had an account receivable from Budgeted [sic] Services, Inc. of $ 160,354. Being unable to make payments on this debt, Budgeted Services transferred its own accounts receivable for the existing debt. At December 31, 1981, $ 111,568 of these accounts were deemed uncollectible. The annotation on petitioner's 1982 return states: Form 1120 Bad Debt Deduction. The company is deducting an extraordinary bad debt of $ 51,095 which is not being charged against the reserve for bad debts. The company had an account receivable from Budgeted [sic] Services, Inc. of $ 160,355. Being unable to make payments on this debt, Budgeted Services transferred its own accounts receivable for the existing debt. At December 31, 1981 $ 109,260 of these accounts were deemed uncollectible and at December 31, 1982 $ *528 51,095 were deemed uncollectible. OPINION The issue for decision is whether petitioner is entitled to deduct as a bad debt under section 166 a group of consumer accounts receivable totaling about $ 162,664. In 1981 petitioner accepted the accounts receivable in exchange for release of a $ 162,664 obligation owed to it by the estate. Petitioner's position is that $ 111,568 of the accounts claimed as a bad debt deduction on its 1981 return became worthless in 1981 and the remaining $ 51,095 became worthless in 1982. As discussed below, we hold that petitioner is not entitled to bad debt deductions under section 166. 1. Burden of Proof
As a preliminary matter, petitioner argues that the burden of proof is on respondent because the notice of deficiency did not detail the theories upon which respondent now relies. The Explanation of Items portion of the notices of deficiency states, in part, the following: The bad debt deduction shown on your return as a result of the acceptance of installment contracts from Budget Services have not been shown to be worthless in the year claimed. In addition, the Estate of M. C. Wedum had sufficient assets to satisfy the claim. Accordingly, *529 your taxable income is increased $ 111,568.00. and * * * Since you [petitioner] did not establish that the amount shown of $ 60,098.00 in 1982 was a bad debt or was your [petitioner's] bad debt loss, we have disallowed it. Petitioner alleges that respondent has changed positions and now argues: (1) the $ 162,664 Budget Services receivable was released as part of the settlement of the estate litigation; (2) the consumer accounts receivable were worthless in Budget Service's hands; and (3) the bad debt deduction claim fails because petitioner did not file a claim in probate against the estate. We have held that the assertion of a new theory which merely clarifies or develops the original determination without being inconsistent or increasing the amount of the deficiency is not a new matter requiring the placing of the burden of proof on respondent as to such theory. However, if the changed assertion either alters the original deficiency or requires the presentation of different evidence, then respondent has introduced a new matter. Carland, Inc. v. Commissioner, 90 T.C. 505, 542 (1988) affd. in part, revd. in part on other grounds F.2d *530 (8th Cir. 1990); Achiro v. Commissioner, 77 T.C. 881, 890 (1981); Estate of Jayne v. Commissioner, 61 T.C. 744, 748-749 (1974); McSpadden v. Commissioner, 50 T.C. 478, 492-493 (1968). Where, as here, respondent merely questions some of the elemental facts that petitioner must prove, and the arguments raised involve the same Code section, are consistent with the original deficiency, and do not affectthe amount of the deficiency, petitioner retains the burden of proof. Estate of Jayne v. Commissioner, supra at 749. We find respondent's explanation to be sufficient to apprise petitioner of respondent's determination. In addition, we note that petitioner has not claimed surprise or that additional evidence would be required. Respondent's explanation is sufficient to apprise petitioner that respondent challenged the bad debt deduction. We do not find any change in respondent's position or any other new matter sufficient to place the burden of proof on respondent under Rule 142(a). 2. Bad Debt Deduction
In computing a taxpayer's net income, bona fide debts which become worthless within the taxable year are *531 allowed as a deduction. Sec. 166(a)(1). This case involves two different debts or obligations. The first is an amount owed to petitioner from Budget Services. The second is a group of consumer installment purchase accounts for appliances charged off by petitioner over the two years at issue. a. Debt Payable to Taxpayer Claiming Deduction
The debts upon which petitioner claims its bad debt deductions are the consumer accounts receivable. To be deductible, the debt must be payable to the taxpayer claiming the deduction. Kentucky Rock Asphalt Co. v. Helburn, 108 F.2d 779 (6th Cir. 1940); Estate of Acheson v. Commissioner, a Memorandum Opinion of this Court dated November 25, 1944, affd. 155 F.2d 369 (5th Cir. 1946). However, the taxpayer need not be the original creditor. Houk v. Commissioner, 173 F.2d 821, 823-824 (5th Cir. 1949), revg. a Memorandum Opinion of this Court. The assignee creditor stands in the same position as the assignor creditor. Jones v. Commissioner, 38 F.2d 550 (7th Cir. 1930), revg. 14 B.T.A. 729 (1928); Western Woodwork & Lumber Co. v. Commissioner, a Memorandum *532 Opinion of this Court dated May 9, 1947. Thus, transfer of the consumer accounts receivable from Budget Services to petitioner is not, in and of itself, an impediment to petitioner's bad debt deduction. b. No Deduction If Debt Worthless When Received
Debts acquired from others are not deductible as bad debts unless such debts had value at the time they were acquired. Elmore Milling Co. v. Helvering, 70 F.2d 736, 737 (D.C. Cir. 1934), affg. 27 B.T.A. 84 (1932) (deficiency sustained where no evidence of basis to transferee); Townsend v. Commissioner, 13 B.T.A. 386, 393 (1928) (bad debt loss from inherited notes must be measured by the value of the notes at the time the notes were distributed and lack of such evidence precludes deduction); Hughes v. Commissioner, a Memorandum Opinion of this Court dated March 7, 1951; (taxpayers failed to establish a fair market value for the debt in the year acquired, thus impossible to determine amount of loss, if any); Pacific Realty Corp. v. Commissioner; 5 B.T.A. 1223, 1226 (1927) (no proof of value in note when transferred); Broderick v. Anderson , 23 F. Supp. 488 (S.D.N.Y. 1938) *533 (taxpayer not entitled to bad debt deduction where there is no showing of the value of the transferred debts). A bad debt claim cannot be the basis for a loss at some later date if the debts were worthless when received. Fink v. Commissioner, 29 T.C. 1119, 1130 (1958) (cancellation of a debt in return for the assignment of a claim which was worthless at the time of the assignment does not give rise to a bad debt deduction under section 23(k) of the Internal Revenue Code of 1939, the predecessor to section 166); Thompson v. Commissioner, 22 T.C. 507, 513-514 (1954); Russell Box Co. v. Commissioner, 208 F.2d 452 (1st Cir. 1953), affg. a Memorandum Opinion of this Court dated January 23, 1953; Raymond R. Bill & Co. v. Commissioner, 15 B.T.A. 320, 321-322 (1929)). Petitioner's position is that the consumer accounts receivable were worth $ 162,664 because that is the amount that petitioner gave up as consideration to acquire the consumer accounts receivable. For whatever reason, petitioner did not sufficiently review the accounts receivable that it was receiving to know or establish their value. *534 Petitioner has failed to provide any other evidence of the value of the consumer accounts receivable when received. We recognize that they were received as part of an agreement canceling a $ 162,664 debt owed to petitioner; but the fact that unidentified, unexamined, aging accounts receivable were given to and accepted by petitioner convinces us that the parties did not treat the debt owed to petitioner as worth $ 162,664. The value of the consumer accounts receivable, if any, when transferred from Budget Services to petitioner is unknown. Value cannot be based upon hope alone. Denver & Rio Grande Western Railroad Co. v. Commissioner, 279 F.2d 368 (10th Cir. 1960), affg. 32 T.C. 43 (1959); Ott v. Commissioner, T.C. Memo. 1967-117. Petitioner has failed to prove that the accounts receivable had value when received by petitioner. C. Deductible in Year Debt Becomes Worthless
A bad debt is deductible only in the year it becomes worthless. Denver & Rio Grande Western Railroad Co. v. Commissioner, 32 T.C. 43, 56 (1959), affd. 279 F.2d 368 (10th Cir. 1960); Perry v. Commissioner, 22 T.C. 968, 973 (1954). *535 A taxpayer who fails to deduct a bad debt in the year in which it becomes wholly worthless loses the deduction. Boehm v. Commissioner, 326 U.S. 287 (1945); James A. Messer Co. v. Commissioner, 57 T.C. 848, 860 (1972). When a debt became worthless is a question of fact, the determination of which lies in an examination of all the circumstances. Boehm v. Commissioner, supra; Lucas v. American Code Co., 280 U.S. 445 (1930). To prove that a debt is worthless in a particular year, the taxpayer must prove that the debt had some intrinsic or potential value at the beginning of the year in which it allegedly became worthless, James A. Messer Co. v. Commissioner, supra at 861; Central Bank Co. v. Commissioner, T.C. Memo. 1964-259, and that it actually becomes worthless in the year in question. Cambridge Hotels, Inc. v. Commissioner, T.C. Memo. 1968-263. Petitioner did not prove that the consumer accounts receivable had value at the beginning of the year. Petitioner argues that after "diligent and considerable efforts to collect them, they proved to be worthless" *536 in the taxable years at issue. Assuming the collection effort to be diligent, the inability to collect shows that the consumer accounts were worthless in the years at issue, but does not show when they became worthless. The vast majority of the accounts receivable cards indicate that the balances due to Budget Services had become zero before they were transferred to petitioner. The remaining accounts were largely inactive with last payments made in 1978 and 1979. Some cards indicated that the accounts had been transferred to other entities by Budget Services. Other accounts had been paid by dealers or charged to a dealer's reserve account. We cannot place any value on the accounts receivable as of July 23, 1981. Thus , we are unable to sustain petitioner's position. To reflect concessions, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code (Title 26 of the United States Code), as amended and in effect for the years in issue, and all rule references are to the Tax Court Rules of Practice and Procedure.↩
2. See Estate of Wedum v. Commissioner, T.C. Memo 1989-184; and Estate of Wedum v. Commissioner, T.C. Memo 1986-247↩.